## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| BARBARA WALLER, ELIZABETH JOHNSON, and RANDEL CLARK, on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>    v.<br><br>ROCKET COMPANIES, INC., a Delaware Corporation, ROCKET MORTGAGE, LLC, AMROCK HOLDINGS, LLC, and ROCKET HOMES REAL ESTATE LLC, Michigan Corporations,<br><br>         Defendants. | Case No. 2:26-cv-10270 |

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

<u>Page</u>

I.      INTRODUCTION ....................................................................................1

II.     PARTIES .................................................................................................5

     A.     Plaintiffs ......................................................................................5

            1.     Plaintiff Barbara Waller ..................................................5

            2.     Plaintiff Elizabeth Johnson ............................................5

            3.     Plaintiff Randel Clark .....................................................6

     B.     Defendants ...................................................................................6

III.    JURISDICTION AND VENUE ..............................................................7

IV.    FACTUAL ALLEGATIONS ..................................................................9

     A.     The CFBP's Investigation ..........................................................9

     B.     The Illegal Steering Scheme ....................................................13

            1.     The "Preserve and Protect" Agreement .......................13

            2.     The illegal steering scheme successfully coerced agents into violating their fiduciary duties ...............15

            3.     Rocket also illegally steered clients to its title company. .......................................................................19

            4.     Post-acquisition, the illegal steering continued. .......20

     C.     The Harmful and Long-Lasting Economic Impacts of Rocket's Steering .................................................................24

V.      CLASS ACTION ALLEGATIONS .....................................................27

VI.    TOLLING THE STATUTES OF LIMITATIONS ...............................30

VII.   CLAIMS FOR RELIEF ........................................................................31

011352-11/3445084 V1

COUNT I VIOLATION OF THE REAL ESTATE SETTLEMENT
    PROCEDURES ACT, 12 U.S.C. 2607(a) (On behalf of a
    Nationwide Class)..........................................................................31

COUNT II UNJUST ENRICHMENT (On Behalf of a Nationwide
    Class) .............................................................................................35

REQUEST FOR RELIEF .......................................................................36

DEMAND FOR JURY TRIAL ...............................................................37

011352-11/3445084 V1

Plaintiffs Barbara Waller, Elizabeth Johnson, and Randel Clark bring this action on behalf of themselves and on behalf of the proposed Class, defined below, and allege upon information and belief and the investigation of counsel as follows:

## I.    INTRODUCTION

1.    Buying a home can be a harrowing but critically important ordeal, as a home purchase is the largest investment most Americans will ever make. The burden of this process is compounded by the opaque and byzantine rules on buying and financing the purchase of a home. Homebuyers do not have a full understanding of the home buying and lending process. As a result, they usually have no choice but to rely on real estate agents, who have a fiduciary duty to represent them and serve their best interests.[1]

2.    The Rocket Defendants[2] have exploited the vulnerability of home buyers for profit. The Rocket Defendants compel and reward real estate agents to steer clients to use Rocket's mortgage company to finance the purchase of homes even though Rocket Mortgage's terms are disadvantageous to the clients. In

---

[1] *See, e.g.*, *Kasey, Inc. v. Alpine Realty Now, Inc.*, 2012 WL 10998, at *2 (Mich. Ct. App. Jan. 3, 2012) ("According to Michigan law, a real estate broker is in a fiduciary relationship with his or her clients. The duties of loyalty, fidelity, care and disclosure may arise impliedly from the agent's position or out of an express agency contract in a listing agreement.") (citations omitted).

[2] As detailed below, the "Rocket Defendants" (or "Rocket") are Rocket Companies, Inc.; Rocket Mortgage, LLC; Amrock Holdings, LLC; and Rocket Homes Real Estate LLC.

exchange, the Rocket Defendants funnel leads (in the form of interested buyers or sellers) to real estate agents who, in turn, steer clients to Rocket's mortgage company. Rocket's stated goal is to bring every step of the home-buying and home-financing process under the Rocket roof. As Rocket's CEO Varus Krishna recently proclaimed, "[w]e are building a vertically integrated homeownership platform for the AI era."[3]

3.      Until its acquisition of Redfin in July 2025, Rocket Homes operated a vast referral network through its website, which connected prospective home buyers with third-party real estate agents. Agents were required to pay a 35% "referral fee" to Rocket Homes if they closed on deals as the buyers' agents. In exchange for these leads, agents were required to steer clients to Rocket Mortgage, LLC (Rocket's mortgage company) and *away* from other mortgage providers—all in violation of a real estate agent's fiduciary duties to her clients. This practice has helped catapult Rocket Mortgage into the second largest mortgage originator in the United States.[4]

---

[3] Exhibit 1, Rocket Companies, Inc. Press Release, "Rocket Companies Announces Third Quarter 2025 Results" (Oct. 30, 2025), https://ir.rocketcompanies.com/news-and-events/press-releases/press-release-details/2025/Rocket-Companies-Announces-Third-Quarter-2025-Results/default.aspx.

[4] Exhibit 2, Jeff Ostrowski, "10 largest mortgage lenders in the U.S.," Bankrate (Jan. 15, 2026), https://www.bankrate.com/mortgages/largest-mortgage-lenders/#:~:text=United%20Wholesale%20Mortgage%20retained%20the,lenders%20by%20loan%20origination%20volume.

4.     Much of Rocket's illegal conduct came to light because of a four-year investigation by the U.S. Consumer Financial Protection Bureau ("CFPB"). Based on this investigation, it was revealed that consumers were directly harmed by the steering practice because Rocket Mortgage and its predecessor, Quicken Loans,[5] offered substandard loan packages that charged higher interest rates and offered fewer cost-saving opportunities for home buyers. As a result of these substandard loans, "Rocket Mortgage charged higher rates and fees to consumers who went through the Rocket Homes network compared with consumers who didn't go through the network"[6]—a clear sign of illegal steering under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607.

5.     Rocket also compelled agents and brokers to refer clients to Rocket Mortgage even when those clients had no prior connection to Rocket Mortgage. Agents and brokers who did so were rewarded with more referrals. Rocket Homes also compelled agents and brokers to steer clients to Defendant Amrock, LLC (a Rocket subsidiary) for titles, escrow, and closing services.

6.     Even after the July 2025 acquisition, Defendants continue to illegally steer mortgage business to Rocket Mortgage. Although the acquisition provided

---

[5] In July 2021, Quicken Loans changed its name to Rocket Mortgage. All references to "Rocket Mortgage" include Quicken Loans.

[6] Exhibit 3, Complaint, Case No. 2:24-cv-13442, ECF No. 2 (E.D. Mich. Dec. 23, 2024) ("CFPB Complaint") ; *see id.* ¶ 6.

Rocket with a network of real estate agents, Rocket still makes referrals to third-party agents. Rocket charges these third-party agents a higher referral fee if these agents do not steer their clients to Rocket Mortgage.

7.     All of this conduct is textbook steering. The Rocket Defendants and participating agents were reciprocally giving and receiving a "thing of value," in violation of the Real Estate Settlement Procedures Act ("RESPA"). *See* 12 U.S.C. § 2607(a). Referrals and commissions are a "thing of value." Regulation X, the implementing regulation for RESPA, clarifies that a thing of value includes "the opportunity to participate in a money-making program" and "commissions." 12 C.F.R. § 1024.14(d). The Defendants were engaged in a perpetual loop of illegal referrals and kickbacks, as illustrated below:



8.     Plaintiffs, on behalf of themselves and all persons who purchased a home financed by Rocket Mortgage or Quicken Loans from 2019 to the present (the "Class"), bring this action for Defendants' RESPA violations and unjust enrichment.

011352-11/3445084 V1

Plaintiffs, on behalf of themselves and the proposed Class, seek treble damages, single damages, injunctive relief, disgorgement, and the costs of this lawsuit, including reasonable attorneys' fees.

## II.    PARTIES

### A.    Plaintiffs

#### 1.    Plaintiff Barbara Waller

9.      Plaintiff Barbara Waller is a resident of Douglasville, Georgia. On April 13, 2022, Plaintiff Waller purchased a home in Douglasville using a real estate agent. Plaintiff Waller used Rocket Mortgage to finance the purchase only after the real estate agent pushed Plaintiff Waller toward using Rocket Mortgage. Ms. Waller was not presented with other mortgage options. From the date of her purchase, through the present, Plaintiff Waller did not know, and could not have reasonably known, that Rocket Mortgage's arrangement with real estate agents compelled them to steer clients to Rocket Mortgage in violation of federal law.

#### 2.    Plaintiff Elizabeth Johnson

10.     Plaintiff Elizabeth Johnson is a resident of Kenly, North Carolina. On December 13, 2023, Plaintiff Johnson purchased a home in Kenly using a real estate agent. Plaintiff Johnson used Rocket Mortgage to finance the purchase only after the real estate agent pushed Plaintiff Johnson toward using Rocket Mortgage. Plaintiff Johnson was also pressured to use Amrock for title and appraisal services. From the date of her purchase, through the present, Plaintiff Johnson did not know, and could

not have reasonably known, that Rocket Mortgage's arrangement with real estate agents compelled them to steer clients to Rocket Mortgage and Amrock in violation of federal law.

### 3. Plaintiff Randel Clark

11.     Plaintiff Randel Clark is a resident of Pittsfield, Pennsylvania. On June 17, 2021, Plaintiff Clark purchased a home in Pittsfield using two real estate agents (a husband-and-wife team). Plaintiff Clark used Rocket Mortgage to finance the purchase only after the real estate agents pushed Plaintiff Clark toward using Rocket Mortgage; Plaintiff Clark was not presented with other mortgage options, and he felt that he had no other choice. From the date of his purchase, through the present, Plaintiff Clark did not know, and could not have reasonably known, that Rocket Mortgage's arrangement with real estate agents compelled them to steer clients to Rocket Mortgage in violation of federal law.

## B. Defendants

12.     Defendant Rocket Companies, Inc. is a holding company.[7] It holds equity interests in Defendants identified below.

13.     Defendant Rocket Mortgage, LLC is a Michigan corporation, with its principal place of business located at 30600 Ann Arbor Road East, Suite 201,

---

[7] *See* Exhibit 4, Rocket Companies, Inc. Form 10-Q for the quarterly period ended September 30, 2025, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001805284/2e1bd10d-9ac5-465e-b220-d2dd3950ef1f.pdf.

Plymouth, Michigan. In July 2021, Quicken Loans changed its name to Rocket Mortgage.[8]

14.    Defendant Amrock Holdings, LLC is a Michigan corporation, with its principal place of business located at 30600 Ann Arbor Road East, Suite 201, Plymouth, Michigan.

15.    Defendant Rocket Homes Real Estate LLC is a licensed real estate brokerage in Michigan. Rocket Home's main office and principal place of business is located at 701 Griswold St., Suite 21, Detroit, MI 48226.

### III.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises from violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 USCS § 2601, *et seq.* The Court has subject matter jurisdiction over the unjust enrichment claim under 28 U.S.C. § 1367 as the unjust enrichment claim is so related to the violations of RESPA that it forms part of the same case or controversy.

17.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of

---

[8]    Exhibit 5, "Our history" webpage, Rocket Companies, https://www.rocketcompanies.com/press-room/our-history/.

the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 28 U.S.C. §§ 1331, 1337.

18.     This Court has personal jurisdiction over the Rocket Companies Defendants because these Defendants have (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) their principal place of business in this District; (4) had substantial contacts with the United States, including in this District; and (5) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

19.     Venue is proper in this District because each Defendant transacts substantial business in this District, as alleged throughout this Complaint. These Defendants reside in this District or transact business in this District. These Defendants also market and sell products and services in this District, have had continuous and systematic contacts with this District, and engaged in illegal steering conduct that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV.   FACTUAL ALLEGATIONS

### A.   The CFBP's Investigation

20.   The CFPB has, as Rocket concedes, "broad enforcement powers,"[9] including the ability to issue summons for documents and depositions.[10] In its SEC filings, Rocket noted that the "CFPB has been active in investigations and enforcement actions and, when necessary, has issued civil money penalties to parties the CFPB determines has violated the laws and regulations it enforces."[11] Rocket also recognized that "[o]ur failure to comply with the federal consumer protection laws, rules and regulations to which we are subject, whether actual or alleged, could expose us to enforcement actions or potential litigation liabilities."[12]

---

[9] Exhibit 6, Rocket Companies, Inc. Form 10-K for the fiscal year ended December 31, 2020, at 37, https://www.sec.gov/Archives/edgar/data/1805284/000180528421000010/rkt-20201231.htm.

[10] According to the CFPB, it is an "independent agency of the United States that regulates the offering and providing of consumer financial products and services under 'Federal consumer financial laws,' 12 U.S.C. § 5491(a), which include RESPA[.]" Exhibit 3, CFPB Complaint, ¶ 14. The CFPB also has "independent litigating authority to enforce 'Federal consumer financial laws,' 12 U.S.C. § 5564(a)-(b), including RESPA, 12 U.S.C. § 2607(d)(4)[.]" *Id.* According to its former director Rohit Chopra, "it's a law enforcement agency. It takes big financial institutions to court who cheat consumers." Exhibit 7, Michel Martin, "Former CFPB Director Rohit Chopra discusses actions taken against the agency," NPR (Feb. 10, 2025), https://www.npr.org/2025/02/10/nx-s1-5291491/former-cfpb-director-rohit-chopra-discusses-actions-taken-against-the-agency.

[11] Exhibit 6, supra note 9, at 37.

[12] *Id.*

21.     Pursuant to its law enforcement authority, Rocket acknowledged that "[i]n May 2020, the CFPB issued a civil investigative demand to our subsidiary, Rocket Homes, the stated purpose of which is to determine if Rocket Homes conducted any activities in a manner that violated RESPA and to determine if further CFPB action is necessary."[13]

22.     Following a four-year investigation, in December 2024, the CFPB filed a complaint against Rocket and The Jason Mitchell Group (a real estate brokerage) and its state-specific LLCs. On February 27, 2025, this complaint was dismissed by the Trump Administration. This dismissal has been linked to the Administration's efforts to gut the CFBP's powers entirely, and not a dismissal on the merits.[14] As one media outlet reported, "The main U.S. agency tasked with overseeing the financial products and services used by everyday Americans — from credit cards to checking accounts to home loans — is the latest target of the Trump administration's effort to remake the federal government."[15] According to this article, published on

---

[13] *Id.*

[14] *See* Exhibit 8, NCLC Press Release, "CFPB Abruptly Drops Enforcement Actions Against Corporations Accused of Ripping Off Consumers" (Feb. 27, 2025), https://www.nclc.org/cfpb-abruptly-drops-enforcement-actions-against-corporations-accused-of-ripping-off-consumers/; Exhibit 9, Hugh Son, "Consumer Financial Protection Bureau drops lawsuits against Capital One and Berkshire, Rocket Cos. Units," CNBC (Feb. 27, 2025), https://www.cnbc.com/2025/02/27/cfpb-drops-capital-one-rocket-mortgage-affiliate-lawsuits.html.

[15] *See* Exhibit 10, Joe Hernandez, "The Trump administration has stopped work at the CFPB. Here's what the agency does," NPR (Feb. 10, 2025),

February 10, 2025, "The Consumer Financial Protection Bureau's new leader has shuttered the agency's headquarters and told staffers to stay at home and refrain from doing any work."[16] As *The New York Times* recently reported, the Trump administration is engaged in a "fight to kill the Consumer Financial Protection Bureau," while the acting Director, Russ Vought, has "gutted much of the consumer bureau's work and tried to fire more than 90 percent of its staff."[17] In a February 2025 White House press conference, Trump stated that the CFPB was "very important to get rid of."[18]

23.    The media reported that the dismissal of the Rocket complaint was part of this effort to gut the agency;[19] indeed, there was no indication that the dismissal was based on the merits of the claims.

_____

https://www.npr.org/2025/02/10/nx-s1-5292123/the-trump-administration-has-stopped-work-at-the-cfpb-heres-what-the-agency-does.

[16] *Id.*

[17] *See* Exhibit 11, Stacy Cowley, "As Consumer Bureau's Cash Dwindles, Trump Administration Declares its Funding Illegal," The New York Times (Nov. 12, 2025), https://www.nytimes.com/2025/11/12/business/consumer-bureau-funding-illegal-cfpb.html.

[18] Exhibit 12, "Trump confirms goal to shutter CFPB," ABA Banking Journal (Feb. 11, 2025), https://bankingjournal.aba.com/2025/02/trump-confirms-goal-to-shutter-cfpb/ (reporting on Trump's statements that the CFPB "was very important to get rid of" at a White House press conference).

[19] *See* Exhibit 9, supra note 14 (noting dismissal of complaints, including against Rocket, "are the latest sign of the abrupt shift at the agency since acting CFPB Director Russell Vought took over this month"); Exhibit 13, Matt Egan, "Consumer watchdog quits cases against firms accused of ripping off Americans," CNN (Feb. 27, 2025), https://www.cnn.com/2025/02/27/business/cfpb-elon-musk-capital-one-student-debt ("The decision to abandon the cases [including against Rocket]

24.     Less than three months after the CFBP filed its complaint, on March 10, 2025, Rocket announced the acquisition of real estate company Redfin, for a reported $1.75 billion.[20] On July 1, 2025, the acquisition was finalized, bringing more than 2,200 real estate agents into Rocket's orbit.[21] Upon information and belief, Rocket knew and recognized that it was engaged in illegal steering, and—after it was caught by the CFPB—decided to acquire Redfin to bring the steering practice in-house.

---

demonstrates the hands-off approach to regulation from the Trump administration, which has scrambled to sideline the CFPB in recent weeks in an effort led by Elon Musk's Department of Government Efficiency (DOGE)."); Exhibit 14, Jordan Weissmann, "The CFPB just dropped a bunch of its own lawsuits as the agency's future hangs in limbo," Yahoo! Finance (Mar, 1, 2025), https://finance.yahoo.com/news/the-cfpb-just-dropped-a-bunch-of-its-own-lawsuits-as-the-agencys-future-hangs-in-limbo-214153537.html ("The Consumer Financial Protection Bureau (CFPB) abruptly dropped five of its own lawsuits against companies it had accused of victimizing customers on Thursday [including Rocket] as the political and legal battle over the Trump administration's efforts to radically downsize the agency raged on.").

[20] Exhibit 15, Nathan Gomes, "Rocket Companies to buy real estate firm Redfin in $1.75 billion deal," Reuters (Mar. 10, 2025), https://www.reuters.com/markets/deals/rocket-companies-buy-real-estate-firm-redfin-175-billion-deal-2025-03-10/.

[21] Exhibit 16, Victor Whitman, "Seattle-based Redfin's sale to Rocket could shift online homebuying market," The Seattle Times (Mar. 11, 2025), https://www.seattletimes.com/business/seattle-based-redfins-sale-to-rocket-to-shift-online-homebuying-market/.

**B.    The Illegal Steering Scheme**

**1.    The "Preserve and Protect" Agreement**

25.    The scheme to steer clients to Rocket Mortgage, and to steer clients to agents who complied with the scheme, is not a matter of speculation or conjecture. This scheme is memorialized in the "Preserve and Protect" agreement that Rocket Homes required its "Partner Agents" to sign. The 2019 version of Rocket's "Terms and Conditions" stated that "as a Broker in our Network, it is important to preserve and protect the relationship between the client and their [sic] ***chosen lender***, Quicken Loans [n/k/a Rocket Mortgage]."[22]

26.    The Terms and Conditions also required agents and brokers to "educate themselves and the client on the benefits of using Quicken Loans and other Rock Family of Companies services."[23] It contained a warning that "purposefully steering a client from Quicken Loans to another mortgage lender is prohibited and could result in termination of the Broker's relationship with Rocket Homes."[24] The meaning of "purposefully" could mean anything Rocket wants it to mean, including the mere mention to clients of other possible lenders.

27.    According to the terms and conditions document, "Partner Agent performance is a critical factor in assigning clients. Rocket Homes measures Partner

---

[22] Exhibit 3, ¶ 41.

[23] *Id.*

[24] *Id.*

Agent success within the client's desired search area by monitoring the following Key Performance Indicators: [2] Quicken Loans conversion, and [4] Quicken Loans Mortgage Banker satisfaction rating." Rocket Homes tracked the performance of its "Partner Agents" through metrics and tracked the rate at which brokers and agents were able to refer client to Rocket Mortgage (or Quicken Loans). Rocket Homes used these statistics to determine which agents received referrals, and how many they received. Quicken Loans loan officers also rated and tracked the rate at which Partner Agents steered clients to Quicken/Rocket Mortgage through a "satisfaction rating" the loan officers gave to agents.[25]

28.     The 2022 version of Rocket's "terms and conditions" ("T&C") maintained the "preserve and protect" requirement. The agreement emphasizes that "Rocket Homes expects brokers and Verified Partner Agents to preserve and protect the relationship between Rocket Mortgage and our mutual client."[26] This expectation to "preserve and protect" the referral relationship violates the fiduciary duties that agents owe to their clients. Through their fiduciary duties, agents owe their clients loyalty, fidelity, care, and disclosure.[27] Yet the preserve and protect agreement

---

[25] *Id.* ¶¶ 41-42.

[26] Exhibit 17, "Should You Trust Your Real Estate Agent's Lender Recommendation? What You Need to Know," Sellinglater.com (Mar. 13, 2024), https://www.sellinglater.com/blog/should-you-trust-your-real-estate-agent-s-lender-recommendation-what-you-need-to-know.

[27] *See Kasey, Inc.*, 2012 WL 10998, at *2-3.

require agents to be loyal to Rocket Mortgage instead of their clients. The T&C further warned agents that failure to adhere to this requirement "could result in termination of the broker's relationship with Rocket Homes."

29.    The 2022 T&C also maintained the "satisfaction rating" system, and required agents to warn Rocket Mortgage "when clients are considering other lending sources" and directed agents to "establish a relationship with the Rocket Mortgage banker assigned to the client."[28]

30.    Only in March 2024 did Rocket remove the "preserve and protect" requirement, although—after five years of this policy—agents likely believed that the spirit of this policy remained, even if it was no longer formalized in writing.

### 2.    The illegal steering scheme successfully coerced agents into violating their fiduciary duties

31.    Rocket's steering scheme was designed to funnel as many clients as possible into the Rocket pipeline, eventually steering them to Rocket Mortgage. Some clients begin the homebuying process by first going to Rocket Mortgage, including getting a preapproval letter for a loan. But getting a preapproval letter is just a first step: a substantial number of potential buyers obtain a mortgage through other lenders. But Rocket Homes, through this scheme, worked to pressure clients

---

[28] Exhibit 3, ¶ 46.

into thinking that they had no other option than to use Rocket Mortgage as their mortgage provider.

32.    Rocket Mortgage then encouraged these clients to go to Rocket Homes to look for a home. Rocket Homes, in turn, matched the client with a third-party real estate brokerage or real estate agent. If the match led the client to buying a home using the agent, then the brokerage paid Rocket Homes a given percentage (usually around 35%) as a kickback. This payment was not made for any service Rocket Homes performed related to the client.

33.    Some clients also start the home buying process on Rocket Homes, which is now Redfin. Rocket Homes referred these clients to third-party real estate brokerages or real estate agents. If the client purchased the home, Rocket Homes would receive a kickback, in that Rocket Homes required agents who received referrals to push clients to use Rocket Mortgage.

34.    The effort to limit the clients' options was successful. According to the CFPB investigation, "some agents hesitated to recommend certain loan options to clients, like first-time homebuyer assistance with down payments, USDA loans, and loans on manufactured housing, because Rocket Mortgage did not have those options (even as 70% of Rocket Homes consumers are first-time homebuyers)." In addition, "other agents deliberately steered clients away from comparison of Rocket Mortgage's subpar terms with other lenders' terms."

35.     Rocket Homes reminded agents of the "Preserve and Protect" requirement every single time it made a referral. For each referral, Rocket Homes sent the broker or agent a "client profile and referral agreement," which warned agents that "Rocket Mortgage is the client's chosen leader. Any purposeful steering away from Rocket Mortgage is prohibited." But this is plainly *false*: many of these referrals, as mentioned above, had no connection with Rocket Mortgage. These clients did not "choose" Rocket Mortgage at all. Nevertheless, agents were discouraged from discussing other lender options and were pressured into steering those clients to Rocket Mortgage, who they did not originally select, and who offered a substandard, more expensive product.

36.     According to the CFBP investigation, "Rocket Homes threatened, suspended, and sometimes removed real estate agents that didn't adequately steer their clients away from other mortgage lenders."[29] Rocket's enforcement tactics included "reprimanding a real estate agent whose client complained about Rocket Mortgage's rates and fees seeming high, and the agent then suggesting the client get a second opinion from a local lender."[30] Rocket Homes also "reprimanded another agent for telling their client that other lenders work with people who have lower credit scores."[31]

---

[29] Exhibit 3, ¶ 51.

[30] *Id.*, ¶ 52.

[31] *Id.*

37.     Further, according to the CFBP:

> Rocket Homes also **_punished_** real estate agents who helped their clients obtain down payment assistance if Rocket Mortgage didn't participate in those programs. For example, Rocket Homes **_punished_** a real estate agent for setting their client up with a local lender, who obtained $15,000 in down payment assistance from the Tennessee Housing Development Agency (THDA). Rocket Mortgage didn't participate in the THDA program at the time.[32]

38.     In other words, Rocket Homes **_actively discouraged_** real estate agents from fulfilling their fiduciary duties to their clients and **_punished_** those who sought financial assistance for their clients, especially for first-time home buyers. According to the CFPB investigation, an "estimated 50% of all the penalties Rocket Homes assessed on real estate agents were for the agents' violations of the preserve and protect requirement."[33]

39.     Rocket Homes also set an absurdly high target rate for "conversions" (a/k/a successful steering). They pressured brokers and agents to reach an 80% capture rate: four out of five clients had to use Rocket Mortgage, including clients who had no interest in or connection with Rocket Mortgage in the first instance. According to the CFPB investigation, "Rocket Homes made numerous calls to real estate brokerages where it emphasized the need for the brokerage to meet the 80%

---

[32] *Id.*, ¶ 53 (emphases added).
[33] *Id.*, ¶ 54.

figure. Rocket Homes also made real estate brokerages explain what steps they were taking to deal with agents who weren't hitting their capture-rate goals."[34]

40.    As a result of this pressure campaign, according to the CFPB, "many reported censoring themselves in response to their client's questions about other lenders or loan programs and instead repeatedly talking up Rocket Mortgage. Some even disparaged Rocket Mortgage's rival lenders."[35] These steering efforts "resulted in more than 10,000 additional referrals sent to Rocket Mortgage during 2019 compared with the previous year."[36]

### 3.    Rocket also illegally steered clients to its title company.

41.    As referenced above, Rocket Homes also directed real estate brokers and agents to steer clients to Amrock, Rocket Homes' title company. The 2022 "terms and conditions" booklet states that "Rocket Homes encourages our Verified Partner Agents to utilize Amrock, LLC for all Rocket Homes clients." Rocket Homes also provided a reminder worksheet for the "Key Points" from a mandatory 2021 training. The third "Key Point" was "**Setting Clients Up for Title with Amrock**. [] Why Amrock is the preferred title company of Rocket Homes and Rocket Mortgage; The 4 easy steps to set your client up for title."[37] Rocket Homes

---

[34] *Id.*, ¶¶ 56-57.

[35] *Id.*, ¶ 58.

[36] *Id.*, ¶ 63.

[37] *Id.*, ¶ 67.

also pushed this message to brokers and agents in terms at "roadshow" training sessions.

### 4. Post-acquisition, the illegal steering continued.

42. Rocket Mortgage acquired Redfin in July 2025. Redfin is an online real estate brokerage website. According to Rocket Companies, Redfin is the "most-visited real estate brokerage website."[38] This acquisition likely represents an attempt to bring Rocket's steering scheme in-house; the acquisition also gives Rocket the ability to illegally steer even more agents.

43. Rocket illegally steers Redfin agents to refer clients to Rocket Mortgage, despite the fact that Rocket and Redfin are "affiliated businesses" based on Rocket's acquisition of Redfin.[39] While RESPA includes safe harbor provisions to allow "affiliated businesses" to provide referrals to each other, these businesses (1) need to provide clients with a properly formatted written disclosure of the affiliate relationship at the time of the referral, (2) cannot require a client to use the

---

[38] Exhibit 18, Rocket Companies Press Release, "Rocket Companies Completes Acquisition of Redfin" (July 1, 2025), https://ir.rocketcompanies.com/news-and-events/press-releases/press-release-details/2025/Rocket-Companies-Completes-Acquisition-of-Redfin/default.aspx.

[39] 12 U.S.C. § 2602 (an affiliate relationship exists when an entity has "either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services").

referred business, and (3) the only thing of value that can be received from the affiliate relationship is a return on ownership interest or franchise relationship.[40]

44.   Rocket is providing Redfin agents with a "thing of value," and the "thing of value" is not a return on ownership interest or franchise relationship; accordingly, the safe harbor provision does not apply. Rocket provides Redfin agents with an increased number of leads if they refer clients to Rocket Mortgage.[41] As one illustration, on an episode of Anton Stetner's real estate-related podcast, entitled "How Rocket Mortgage's Redfin Acquisition Could DESTROY Traditional Real Estate," Stetner explains how consumers may not have a choice in lenders because Redfin agents will just steer clients to Rocket Mortgage.[42] As Stetner's guest

---

[40] 12 C.F.R. § 1024.15.

[41] Exhibit 19, Facebook post by user Sara Shivani Cameron (Mar. 11, 2025), https://www.facebook.com/groups/realesthumor/posts/3988885401390207 (discussing the impact on agent's leads after Rocket acquired Redfin; one comment states, "That's one way to get people to actually use their mortgage company lol"); Exhibit 20, YouTube Short video titled "Rocket Mortgage buys Seattle based Redfin!" by user @thetrumanexperience (Mar. 11, 2025), https://www.youtube.com/shorts/Vtsidfmlh7k (suspecting that Rocket bought Redfin to receive "loan leads"); Exhibit 21, Reddit post titled "With Rocket Mortgage purchasing Redfin, what do you think will ultimately happen?" (Mar. 16, 2025), https://www.reddit.com/r/realtors/comments/1jd01u9/with_rocket_mortgage_purc hasing_redfin_what_do/ (commenters explaining that agents' leads will differ based on their attach rates to Rocket Mortgage).

[42] Exhibit 22, YouTube video titled "How Rocket Mortgage's Redfin Acquisition Could DESTROY Traditional Real Estate," by user Anton Stetner (Mar. 15, 2025), https://www.youtube.com/watch?v=teq4ynXzaDk (suspecting that Rocket bought Redfin to "control the whole real estate pipeline" and that consumers may not have

commented, "Listen, you know a lot of people don't even have agents, right. So they just use the Redfin agent and they're like, yeah, I need financing. It's like, oh yeah, I got you right, they might not care it's Rocket Mortgage but the problem is [] they won't even have a choice."[43] Another real estate agent posted on Reddit as follows:

> Redfin agents are required to push their company Rocket Mortgage. They'll also tell you to use Title Forward.
>
> Rocket Mortgage has terrible reviews, they suck for any kind of transactions that aren't the most simple/vanilla, they'll also issue incorrect preapprovals and put you and your earnest money at risk.
>
> Title Forward is criminally incompetent - many many many stories about the egregious mistakes they've made.
>
> All owned by the same company.
>
> You probably clicked the 'show me this house' button to find the agent right?
>
> So, all of your "partners" in the largest purchase of your life are affiliated and only benefit if you close the purchase transaction, and none of them are vetted. No independent unrelated representation for you.
>
> No checks/balances, little concern for your best interests.[44]

---

a choice in lender because Redfin agents will just steer consumers to Rocket Mortgage).

[43] *Id.*

[44] Exhibit 23, Reddit post titled "Potential Redfin Buyer's Agent Pushing Rocket Mortgage Hard. Red Flag?" (Oct. 28, 2025), https://www.reddit.com/r/RealEstate/comments/1oih6ik/potential_redfin_buyers_agent_pushing_rocket/ (comments discussing how agents are "most likely required to send you a referral to Rocket Mortgage"; "Rocket bought Redfin earlier this year,

45.     As discussed above, referrals and commissions are a "thing of value." Regulation X, the implementing regulation for RESPA, clarifies that a thing of value includes "the opportunity to participate in a money-making program" and "commissions."[45] Referrals are also not a return on ownership. In fact, payments that differ based on referral rates are impermissible even in affiliate business relationships.[46] An agent's income depends on commissions, and their commissions are directly tied to the amount of leads they get. Rocket provides Redfin agents with increased referrals, a thing of value, in exchange for agents referring clients to Rocket Mortgage, a thing of value. Requiring agents to give referrals to Rocket Mortgage to receive leads is evidence of an illegal steering scheme and unjust enrichment.[47]

46.     In addition to illegal steering *within* the Rocket companies, Rocket is also charging third party agents higher commissions if the agents do not steer customers to use Rocket Mortgage.

---

thus the push"; "Rocket Mortgage bought Redfin for this very reason. It's the same umbrella company."; "Redfin agents are required to push their company Rocket Mortgage. They'll also tell you to use Title Forward.").

[45] 12 C.F.R. § 1024.14(d).

[46] 12 C.F.R. § 1024.15(b)(3)(ii).

[47] *See In the Matter of JRHBW Realty, Inc., doing business as RealtySouth; TitleSouth, LLC*, CFPB No. 2014-CFPB-0005 (May 28, 2014) (CFPB Administrative Proceeding finding a RESPA violation in part because of a referral scheme between affiliated businesses).

**C.      The Harmful and Long-Lasting Economic Impacts of Rocket's Steering**

47.     Rocket's steering practice can have long-lasting impacts on the housing market. As one article described steering practices, "experts warn this apparent efficiency is masking a system designed to steer homebuyers to the platforms' own mortgage lenders, squeezing out competition and discouraging buyers from finding cheaper options."[48] According to this article, it is "part of massive consolidation and restructuring efforts by Zillow and Redfin's corporate owners to corner the trillion-dollar mortgage market, *which is already driving up housing costs and could heighten the risk of a financial crisis*."[49] Although Zillow and Redfin are mentioned by name in this article, the description of the conduct applies equally to Rocket, especially now that Rocket has acquired Redfin.

48.     As stated above, a whopping 70% of all Rocket consumers are first-time home buyers, yet Rocket deliberately did not tell them about the assistance they can receive from state and federal programs because Rocket did not offer these programs for many years. Until August 2022, Rocket had a blanket policy of not participating in any of these first time home buyer programs.[50] These programs would have been a huge benefit for first-time home buyers. For example, the

---

[48] Exhibit 24, Helen Santoro, "Zillow and Redfin May Be Steering Homebuyers Into Bad Deals," Jacobin (Sept. 16, 2025), https://jacobin.com/2025/09/zillow-redfin-mortgage-lending-competition.

[49] *Id.* (emphasis added).

[50] Exhibit 3, ¶ 78.

Tennessee Housing Development Agency ("THDA") provides the option for homeowners to receive $6,000 in down payment assistance, as an interest-free, forgivable second mortgage.[51] This program also provides a homeowner with up to $15,000 in down payment assistance at the same interest rate as the first mortgage.[52]

49.    As a result of all of these factors, according to CFPB's investigation, "Consumers who went through the Rocket Homes network and obtained a mortgage from Rocket Mortgage paid higher rates and fees than consumers who didn't go through the referral network, and who therefore weren't subjected to the Rocket Homes steering requirements."[53]

50.    Rocket's illegal conduct can also have devastating impacts on buyers over the long run, particularly those saddled with a higher interest rate mortgage: "Unbeknownst to many consumers, shopping around for a home loan can save homebuyers an average of more than $80,000 over a thirty-year mortgage. In states like California, Hawaii, and Washington, lifetime savings can reach more than $100,000. Consumers who use real estate companies' in-house lenders may also be forced to pay higher fees and interest charges than those who use alternative options."[54] Agents steering clients exclusively to Rocket Mortgage, as opposed to

---

[51] Exhibit 25, Tennessee Housing Development Agency, Down Payment Assistance webpage, https://thda.org/homebuyers/down-payment-assistance.

[52] *Id.*

[53] Exhibit 3, ¶ 81.

[54] Exhibit 24, supra note 48.

recommending multiple lenders and shopping around, had a negative financial impact on clients. This steering happened in violation of agents' fiduciary duties to their clients.

51.    At the same time, Rocket Mortgage has profited handsomely from its steering policies. Rocket Mortgage generated $101.2 billion in closed loan origination volume in 2024, a 29% increase in comparison to the prior year.[55] The Rocket Companies made $5.1 billion in total revenue in 2024, up 34% year-to-year.[56] The Rocket Companies' purchase market share grew by 8% year-over-year in 2024. According to Rocket Companies, this growth was fueled by "strategic optimizations."[57] Third quarter revenue for 2025 (released on October 30, 2025) show a 148% year-over-year growth for the quarter of $1.78 billion. By all of these measures, its steering program has been a resounding success.

---

[55] Exhibit 26, Rocket Companies Press Release, "Rocket Companies Announces Fourth Quarter and Full Year 2024 Results" (Feb. 27, 2025), https://ir.rocketcompanies.com/news-and-events/press-releases/press-release-details/2025/Rocket-Companies-Announces-Fourth-Quarter-and-Full-Year-2024-Results/default.aspx
[56] Exhibit 27, Katie Jensen, "Rocket Companies Posts Record Revenue In Latest Earnings Report," National Mortgage Professional (Feb. 27, 2025), https://nationalmortgageprofessional.com/news/rocket-companies-posts-record-revenue-latest-earnings-report.
[57] Exhibit 26, supra note 55.

## V.    CLASS ACTION ALLEGATIONS

52.    Plaintiffs bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of the following Class based on RESPA violations (12 U.S.C. § 2607(a)):

> All persons and entities in the United States who, from January 1, 2019, to the present, purchased a home, and used Rocket Mortgage or Quicken Loans to finance the purchase.

53.    Excluded from the Class and Steering Subclass are Defendants, their officers, directors and employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officers presiding over this action and the members of their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

54.    The Class is readily ascertainable because records of the relevant property transactions should exist and are easily obtainable.

55.    The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class has at least hundreds of thousands of members, the exact number and their identities being known to Defendants.

56.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

57.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

     a.     Whether Defendants engaged in the alleged conduct;

     b.     Whether Defendants' conduct violates RESPA, as alleged herein;

     c.     Whether Rocket Mortgage's terms and costs were inferior to other third-party options;

     d.     Whether Defendants' conduct led to their unjust enrichment;

     e.     Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

     f.     Whether Defendants' conduct is unlawful; and

     g.     The appropriate class-wide measures of damages.

58.     Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants, and the

relief sought within the Class is common to each member. There are no defenses available to Defendants that are unique to Plaintiffs or to any particular Class.

59.     Plaintiffs will fairly and adequately represent and protect the interests of the Class, has no interest incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

60.     A class action is the superior method for the efficient adjudication of this litigation because individual litigation would be impracticable and individual litigation would be unduly burdensome to the courts. Because of the size of the individual Class members' claims, no Class member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint. Additionally, Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

011352-11/3445084 V1

61.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

      a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

      b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

      c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class and Steering Subclass members as a whole.

## VI.    TOLLING THE STATUTES OF LIMITATIONS

62.     As of the date of this Complaint, Defendants do not disclose to potential buyers that Rocket "partnership" agents are required to steer buyers to Rocket Mortgage or Quicken Loans. There was no reasonable way for the public, including

Plaintiffs, to know that Rocket required its partnership agents to steer buyers to Rocket Mortgage or Quicken Loans, which offers a substandard product. As a result, Plaintiffs and other members of the public did not discover and reasonably could not have discovered Defendants' RESPA violations and unjust enrichment. Any applicable statutes of limitations or response are accordingly tolled.

63.     Additionally, a violation of RESPA occurs every time Rocket engages in its unlawful steering scheme and receives a kickback.[58] Each instance of a kickback also allows Rocket to be unjustly enriched. Each violation thus resets the clock on the statute of limitations.

## VII.   CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. 2607(a) (On behalf of a Nationwide Class)

64.     Plaintiffs Waller, Johnson, and Clark repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

65.     RESPA Section 8(a), 12 U.S.C. § 2607(a), provides that "no person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a

---

[58] *See, e.g.*, *Blake v. JPMorgan Chase Bank, N.A.*, 259 F. Supp. 3d 249, 257 (E.D. Pa. 2017).

part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

66.    A "thing of value" is "broadly defined" under RESPA's implementing regulation by the CFPB under "Regulation X," and includes, among other things, "the opportunity to participate in a money-making program." 12 C.F.R. § 1024.14(d).

67.    The real estate agents who receive referrals from Rocket treasure and rely on these referrals, and these agents consider Rocket referrals as a thing of value. As a result, Rocket referrals are a thing of value under RESPA.

68.    The home loans originated by Rocket Mortgage are a "business incident to or a part of a real estate settlement service" pursuant to RESPA Section 9; *see also* 12 C.F.R. § 1024.2(b) (defining "settlement service").

69.    The title, escrow, and closing services offered by Amrock also constitute "business incident to or a part of a real estate settlement service" within the meaning of RESPA Section 8. 12 U.S.C. §§ 2602(3), 2607(a); *see also* 12 C.F.R. § 1024.2(b) (defining "settlement service").

70.    Regulation X defines a "referral" to include "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service." 12 C.F.R. § 1024.14(f)(1). Moreover, "an agreement or understanding for the referral of business incident to or

part of a settlement service need not be written or verbalized but may be established by a practice, pattern, or course of conduct." 12 C.F.R. § 1024.14(e).

71.    In addition, "when a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business." 12 C.F.R. § 1024.14(e).

72.    Pursuant to 12 U.S.C. § 2602(3), "the term 'Settlement services' includes any service provided in connection with a real estate settlement including, but not limited to, the following: . . . the origination of a federally related mortgage loan."

73.    Pursuant to 12 C.F.R. § 1024.2(b), "Settlement Service means any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following: (1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans) . . . [or] (3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan."[59] Rocket is accordingly a person under Section 8 of RESPA pursuant to 12 U.S.C. §§ 2602(5), 2607.

---

[59] *See also* 12 U.S.C. § 2602(3) ("the term 'Settlement services' includes any service provided in connection with a real estate settlement including, but not limited to, the following: [] services rendered by a real estate agent or broker").

74.     Under these definitions, the mortgage lending services provided by Rocket Home Loans for federally related loans were "settlement services" under RESPA.

75.     Rocket Mortgage is a "creditor" pursuant to 15 U.S.C. § 1602(g), and as incorporated by reference into RESPA at 12 U.S.C. § 2602(1)(B)(iv). Rocket Mortgage makes or invests in residential real estate loans totaling more than one million dollars per year. *See* 12 U.S.C. § 2602(1)(B)(iv).

76.     The vast majority of mortgages originated by Rocket Mortgage during the Relevant Time Period were "federally related mortgage loans" as that term is defined by 12 U.S.C. § 2602(1) and 12 C.F.R. 1024.2(b).

77.     The real estate brokers and agents who received referrals from Rocket made the following referral to Rocket: they affirmatively influenced the Rocket-referred clients to use Rocket Home Loans for financing their home purchase in adherence with Rocket's referral rules and quotas.

78.     Rocket therefore gave a "thing of value" to real estate brokers and agents—the ability to continue receiving referrals and obtaining priority for future referrals—under an agreement or understanding that the real estate brokers and agents would refer real estate settlement business involving federally related mortgage loans to Rocket Home Loans, in violation of RESPA Section 8(a), 12, U.S.C. § 2607(a).

## COUNT II

### UNJUST ENRICHMENT
### (On Behalf of a Nationwide Class)

79.    Plaintiffs Waller, Johnson, and Clark bring this claim for themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

80.    As a result of the wrongful and deceptive conduct of Defendants as alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of referral fee payments by Agents and profits from mortgages that class members were improperly steered towards.

81.    In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Class.

82.    As a result, each Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

83.    The unjust enrichment of Defendants is traceable to, and resulted directly and proximately from, the conduct alleged herein.

84.    Defendants either knew or should have known that referral fee payments by Agents and profits from mortgages that class members were steered towards were obtained improperly. As such, it would be inequitable for Defendants

to retain the benefit of the referral fee payments by Agents and profits from mortgages that class members were steered towards.

85.     The financial benefits derived by Defendants from referral fee payments by Agents and profits from mortgages that class members were steered towards rightfully belong to Plaintiffs and Class members.

Defendants' acceptance and retention of the referral fee payments by Agents and profits from mortgages that class members were steered towards under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and Class members. Plaintiffs and Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully requests that the Court enter judgment in his favor and against Defendants, as follows:

A.     Determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the Class; and declare Plaintiff as the representatives of the Class;

011352-11/3445084 V1

B.     Enter joint and several judgments against the Defendants and in favor of Plaintiff and the Class;

C.     Award the Class damages in an amount to be determined at trial;

D.     Permanently enjoin Defendants' ongoing unlawful conduct;

E.     Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

F.     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: January 26, 2026              Respectfully submitted,

*/s/ Steve W. Berman*
Steve W. Berman
Jerrod C. Patterson
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com

*Attorneys for Plaintiffs*

011352-11/3445084 V1