# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| BARBARA WALLER, ELIZABETH JOHNSON, and RANDEL CLARK, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROCKET COMPANIES, INC., *et al.*,<br><br>Defendants. | Case No. 2:26-cv-10270-LVP-DRG<br><br><br>Hon. Linda V. Parker District Judge |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT AND STRIKE CERTAIN PARAGRAPHS

## TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED ............................................................... vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................ viii

I.      INTRODUCTION ..................................................................................... 1

II.     FACTUAL ALLEGATIONS ..................................................................... 4

        A.      The CFBP Investigation .................................................................. 4

        B.      The Steering Scheme ....................................................................... 7

                1.      Rocket's structure to funnel clients to Rocket
                        Mortgage ............................................................................... 7

                2.      The "Preserve and Protect" Agreement ...................................... 7

III.    ARGUMENT ........................................................................................... 10

        A.      Plaintiffs have sufficiently alleged standing through
                overpayment. ................................................................................. 10

        B.      Plaintiffs' RESPA Claims Are Well-Pled ........................................... 13

                1.      RESPA Claims are not time-barred. ......................................... 13

                        a.      The continuing violations doctrine applies. ................... 13

                        b.      SOL is tolled based on fraudulent
                                concealment. ................................................................. 14

                2.      Rocket engaged in an unlawful steering scheme
                        under RESPA. ..................................................................... 15

                        a.      Rocket's steering scheme involved an
                                exchange of a "thing of value." ..................................... 16

                        b.      Rocket's unlawful steering scheme involved
                                an agreement to refer settlement business,
                                and actual referrals occurred. ....................................... 19

011352-11/3549648 V1

        3.     RESPA's cooperative brokerage safe harbor does not apply...................................................................21

    C.    Defendants Plausibly Allege Unjust Enrichment Claim.....................24

        1.     Defendants were unjustly enriched by their fraudulent scheme. .......................................................24

        2.     The nationwide unjust enrichment class is well-pled. ......................................................................25

    D.    Defendants' Remaining Arguments Fail...............................................25

        1.     Plaintiffs did not engage in group pleading. ............................25

        2.     There is no basis to dismiss claims against Rocket Companies. ..........................................................26

        3.     There is no basis to strike Redfin allegations. ..........................26

IV.    CONCLUSION..................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alston v. Countrywide Fin. Corp.*,
585 F.3d 753 (3d Cir. 2009) ....................................................................22, 23

*In re Auto. Parts Antitrust Litig.*,
2015 WL 13722902 (E.D. Mich. Aug. 31, 2015)...............................................12

*Blake v. JPMorgan Chase Bank, N.A.*,
259 F. Supp. 3d 249 (E.D. Pa. Apr. 26, 2017 ......................................... viii, 3, 13

*Bledsoe v. FCA US LLC*,
378 F. Supp. 3d 626 (E.D. Mich. Mar. 27, 2019)............................... ix, 3, 11, 25

*Bolinger v. First Multiple Listing Serv., Inc.*,
838 F. Supp. 2d 1340 (N.D. Ga. 2012)................................................................2

*Bowen v. City of New York*,
476 U.S. 467 (1986)...........................................................................................15

*Bueno v. Scott*,
2014 WL 1513000 (S.D. Ohio Apr. 16, 2014) ...................................................12

*In re Carter*,
553 F.3d 979 (6th Cir. 2009) ................................................................ viii, 2, 11

*CFPB v. Borders & Borders, PLC*,
2018 WL 1440606 (W.D. Ky. Mar. 22, 2018) ...................................................18

*Chism v. Chemring N. Am. Grp., Inc.*,
2015 WL 8207899 (W.D. Tenn. Dec. 7, 2015)..............................................ix, 26

*Dept. of Labor v. Americare Healthcare Servs. LLC*,
762 F. Supp. 3d 666 (S.D. Ohio Jan. 9, 2025)...................................................17

*Edwards v. First Am. Corp.*,
798 F.3d 1172 (9th Cir. 2015) ........................................................... viii, 18, 19

011352-11/3549648 V1

*Egerer v. Woodland Realty, Inc.*,
  556 F.3d 415 (6th Cir. 2009) ...............................................................14

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
  2018 WL 4352707 (E.D. Mich. Sept. 28, 2018) ................................... viii, 4, 15

*Glass v. Franklin Co., Ky.*,
  2020 WL 3086602 (8th Cir. 2012) ...............................................................4, 26

*Gomez v. Wells Fargo Bank, N.A.*,
  676 F.3d 655 (E.D. Mich. 2010)...............................................................18

*Kallai v. Jatola Homes, LLC*,
  2021 WL 5961626 (N.D. Ohio Dec. 16, 2021) ............................................*passim*

*Llewellyn-Jones v. Metro Prop. Grp., LLC*,
  22 F. Supp. 3d 760 (E.D. Mich. 2014) ...............................................................28

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)...............................................................17

*Marais v. Chase Home Fin. LLC*,
  736 F.3d 711 (6th Cir. 2013) ...............................................................2

*Morgan v. Caliber Home Loans, Inc.*,
  26 F.4th 643 (4th Cir. 2022) ...............................................................17

*Mullen v. Bank of Am.*,
  2011 WL 6961005 (E.D. Mich. Nov. 7, 2011)...............................................................14, 15

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010) ...............................................................13

*Palombardo v. Emery Fed. Credit Union*,
  2017 WL 3437559 (S.D. Ohio Aug. 10, 2017) ................................... viii, 18, 21

*In re Polyurethane Foam Antitrust Litig.*,
  799 F. Supp. 2d 777 (N.D. Ohio 2011) ...............................................................12

*Smith v. Lawyers Title Ins. Corp.*,
  2009 WL 514210 (E.D. Mich. Mar. 2, 2009)...............................................................15

- iv -

*Soehnlen v. Fleet Owners Ins. Fund*,
844 F.3d 576 (6th Cir. 2016) ...................................................................13

*Solo v. UPS*,
819 F.3d 788 (6th Cir. 2016) ...................................................... ix, 4, 24

*Supriyanto v. Bank of Am.*,
2023 WL 7107133 (C.D. Cal. June 29, 2023)..........................................13

*U.S. v. Mead Corp.*,
533 U.S. 218 (2001)..................................................................................14

*Wesley Corp. v. Zoom T.V. Prods, LLC*,
2017 WL 1295529 (E.D. Mich. Apr. 7, 2017) .......................................... ix, 4, 26

*White v. PNC Fin. Servs. Grp., Inc.*,
2014 WL 4063344 (E.D. Pa. Aug. 18, 2014) ..........................................23

*In re Zillow Grp., Inc. Sec. Litig.*,
2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ...................................... viii, 21

## STATUTES

12 U.S.C. § 2601(b)(2)..........................................................................21, 23

12 U.S.C. § 2602(2) ................................................................................17

12 U.S.C. § 2607....................................................................................... 1

12 U.S.C. § 2607.......................................................................................2

12 U.S.C. § 2607.......................................................................................2

12 U.S.C. § 2617(a) ................................................................................17

## OTHER AUTHORITIES

12 C.F.R. § 1024.14(d) ...........................................................................16

12 C.F.R. § 1024.14(e)............................................................................19

12 C.F.R. § 1024.14(g)(v)......................................................................3, 21

H.R. Rep. No. 97-532, 97th Cong., 2nd Sess. (1982)..............................2

011352-11/3549648 V1

## STATEMENT OF ISSUES PRESENTED

1.   The injury in fact requirement is satisfied if there is an unlawful referral scheme in violation of RESPA, or if there is an overpayment. The Complaint alleges an unlawful referral scheme. The Complaint further alleges Rocket Mortgage charged higher rates and fees to consumers who went through the Rocket Homes network, and homebuyers overpaid for their loans. Do Plaintiffs satisfy the injury in fact requirement for standing?

Plaintiffs' answer: Yes.

2.   Continuing violations and fraudulent concealment toll the statute of limitations for RESPA. Defendants did not disclose to potential buyers that Rocket "partnership" agents are required to steer buyers to Rocket Mortgage. Agents continue to steer buyers to Rocket Mortgage. Do Plaintiffs present timely claims?

Plaintiffs' answer: Yes.

3.   Plaintiffs must plausibly plead the three elements of a RESPA claim: 1) a payment or a thing of value; 2) made pursuant to an agreement to refer settlement business; and 3) an actual referral. Regulation X explains that a thing of value should be broadly interpreted and includes the opportunity to participate in a money-making program. Rocket's "Preserve and Protect" agreement required real estate agents to steer clients to Rocket Mortgage, or their leads were terminated. Real estate agents received value from the commissions they earn on leads. Rocket profits from homebuyers using Rocket Mortgage loans. Have Plaintiffs plausibly alleged a RESPA violation?

Plaintiffs' answer: Yes.

4.   RESPA's cooperative brokerage safe harbor refers only to fee divisions within real estate brokerage arrangements when all parties are acting in a real estate brokerage capacity. It does not apply to arrangements between real estate brokers and mortgage brokers. Rocket Mortgage agreed to, and played a central role in, the referral scheme. Does Defendants' conduct fall outside the safe harbor provision?

011352-11/3549648 V1

Plaintiffs' answer: Yes.

5.    Defendants profited immensely from the steering scheme, and Plaintiffs allege that these profits were unjustly obtained. Have Plaintiffs plead an unjust enrichment claim?

Plaintiffs' answer: Yes.

011352-11/3549648 V1

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

## A. Standing

- *In re Carter*, 553 F.3d 979 (6th Cir. 2009)

- *Kallai v. Jatola Homes, LLC*, 2021 WL 5961626 (N.D. Ohio Dec. 16, 2021)

## B. Statute of Limitations for RESPA

- *Blake v. JPMorgan Chase Bank, N.A.*, 259 F. Supp. 3d 249 (E.D. Pa. 2017), *aff'd*, 927 F.3d 701 (3d Cir. 2019)

- *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2018 WL 4352707 (E.D. Mich. Sept. 28, 2018)

## C. Elements of a RESPA Claim

- *Kallai v. Jatola Homes, LLC*, 2021 WL 5961626 (N.D. Ohio Dec. 16, 2021)

- *Edwards v. First Am. Corp.*, 798 F.3d 1172 (9th Cir. 2015)

## D. RESPA Safe Harbor Provisions

- *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)

- *Palombaro v. Emery Fed. Credit Union*, 2017 WL 3437559 (S.D. Ohio Aug. 10, 2017)

011352-11/3549648 V1

## E. Unjust Enrichment

- *Solo v. UPS*, 819 F.3d 788 (6th Cir. 2016)

- *Bledsoe v. FCA US LLC*, 378 F. Supp. 3d 626 (E.D. Mich. Mar. 27, 2019)

## F. Proper Pleading for Each Defendant

- *Wesley Corp. v. Zoom T.V. Prods., LLC*, 2017 WL 1295529 (E.D. Mich. Apr. 7, 2017)

- *Chism v. Chemring N. Am. Grp., Inc.*, 2015 WL 8207899 (W.D. Tenn. Dec. 7, 2015).

011352-11/3549648 V1

## I.      INTRODUCTION

The Rocket Defendants' motion to dismiss[1] relies on rhetoric and spin that does not comport with reality. They contend that their steering operation provided "exemplary client service" (Mot. at 2, PageID.609), when in fact they required agents to adhere to a "Preserve and Protect" agreement that "punished" agents who did not push unwitting homebuyers into using Rocket Mortgage. ¶¶ 35-37.[2] They compelled agents to pay 35% of their commissions back to Rocket Homes as a kickback, even as Rocket Homes provided no assistance in closing the property transaction. ¶ 32. They falsely warned agents that Rocket Mortgage is the "client's chosen leader," even when these clients had no previous contact with Rocket Mortgage at all. ¶ 35. The guiding principle of the Defendants' structure, as described by Rocket's CEO Varus Krishna, is to "build[] a vertically integrated homeownership platform for the AI era." ¶ 2. This platform does not serve the clients' interests, but only seeks to maximize profit at their expense.

The Real Estate Settlement Procedures Act (RESPA, 12 U.S.C. § 2607) was crafted to prohibit precisely this type of conduct. Congress' intent was to ensure real estate brokers act "impartial[ly]" and offer their "professional evaluation" of a real

---

[1] *See* Defendants' Motion to Dismiss Complaint and Strike Certain Paragraphs, ECF No. 14 ("Mot.").

[2] All references to "¶" herein are to Plaintiffs' Class Action Complaint, ECF No. 1.

- 1 -

estate transaction.[3] The ultimate goal of this statute was to lower the purchase price of a home and avoid "unnecessarily high settlement charges caused by certain abusive practices that have developed[.]" *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013) (citation omitted).

Defendants' abusive practices run afoul of RESPA in two respects. First, RESPA prohibits giving or receiving any "thing of value" in relation to a real estate settlement service involving a federally related mortgage loan. 12 U.S.C. § 2607(a). Defendants violated this statute by sending leads to real estate agents only if those agents steered clients back to Rocket Mortgage. In exchange, Rocket Homes received 35% of the agents' commission. This is textbook steering that RESPA prohibits. *See In re Carter*, 553 F.3d 979, 989 (6th Cir. 2009).

Second, RESPA forbids fee-splitting in real estate settlement services "other than for services actually performed." 12 U.S.C. § 2607(b). The undisclosed 35% kickback to Rocket Homes is not for any service Rocket Homes performed related to the settlement of the real estate transaction. *See Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1352 (N.D. Ga. 2012) (plaintiffs plausible alleged § 2706(b) violation when defendant received "hidden settlement fee" but contributed nothing to property closing). Defendants do not challenge these allegations.

---

[3] H.R. Rep. No. 97-532, 97th Cong., 2nd Sess. at 52 (1982).

011352-11/3549648 V1

Rather than engage with Plaintiffs' actual allegations, Defendants raise a series of technical arguments that lack merit:

*First*, Defendants rely heavily on RESPA's safe harbor provision to evade liability. *See* Mot. at 9-12, PageID.616-619. But this provision only applies to "fee divisions within real estate brokerage arrangements when all parties are acting in a real estate brokerage capacity, and has no applicability to any fee arrangements between real estate brokers and mortgage brokers or between mortgage brokers." 12 C.F.R. § 1024.14(g)(v). In seeking safe harbor succor, Defendants pretend that Rocket Mortgage is not involved in the steering operation, which is nonsense. *See* ¶¶ 3-5, 7, 25-29, 31-33.

*Second*, Plaintiffs have Article III standing because they overpaid for their mortgages, which establishes injury-in-fact. *See Kallai v. Jatola Homes, LLC*, 2021 WL 5961626, at \*4 (N.D. Ohio Dec. 16, 2021). Although Plaintiffs cannot establish the precise dollar value of this overpayment at this stage, the *fact* of overpayment is sufficient to confer standing. *Bledsoe v. FCA US LLC*, 378 F. Supp. 3d 626, 641 (E.D. Mich. Mar. 27, 2019).

*Third*, the continuing violations doctrine tolls RESPA's statute of limitations, and Plaintiffs claims are timely. *Blake v. JPMorgan Chase Bank, N.A.*, 259 F. Supp. 3d 249, 256-57 (E.D. Pa. Apr. 26, 2017), *aff'd*, 927 F.3d 701 (3d Cir. 2019) (discussing and adopting CFBP's decision on tolling SOL based on continuing

011352-11/3549648 V1

violations). Defendants also fraudulently concealed their activity, which further tolls the statute of limitations. *See* ¶¶ 9-11, 62. Although Defendants dispute they concealed their scheme involving undisclosed kickbacks, this is a factual question not amenable to dismissal. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2018 WL 4352707, at *7 (E.D. Mich. Sept. 28, 2018).

*Fourth*, plaintiffs have plausibly alleged the elements of an unjust enrichment claim. *See Solo v. UPS*, 819 F.3d 788, 796 (6th Cir. 2016). In response, Defendants simply reiterate their RESPA arguments and raise factual questions that are not appropriate for a motion to dismiss. Mot. at 21-22, PageID.628-629.

*Fifth*, and contrary to Defendants' assertions, Plaintiffs have plausibly alleged all its claims and have not improperly engaged in group pleading. *See Glass v. Franklin Co., Ky.*, 2020 WL 3086602, at *4 (E.D. Ky. June 10, 2020). Defendants are properly on notice as to Plaintiffs' claims and their role in the scheme. *Wesley Corp. v. Zoom T.V. Prods, LLC*, 2017 WL 1295529, at *2 (E.D. Mich. Apr. 7, 2017).

Defendants' motion to dismiss should be denied.

## II.    FACTUAL ALLEGATIONS

### A.    The CFBP Investigation

The Complaint derives many of its allegations from the complaint filed by the U.S. Consumer Financial Protection Bureau ("CFPB"), which is corroborated by other facts and documents cited in the Complaint. The CFPB is an "independent

- 4 -

agency of the United States that regulates the offering and providing of consumer financial products and services under 'Federal consumer financial laws,'" including RESPA. ¶ 20 n.10. Its former director explained that CFPB is "a law enforcement agency. It takes big financial institutions to court who cheat customers." *Id.*

As Rocket describes in SEC filings, the CFPB has "broad enforcement powers," including the ability to issues summons for documents and depositions. ¶ 20. Rocket conceded that "[o]ur failure to comply with the federal consumer protection laws, rules and regulations to which we are subject, whether actual or alleged, could expose us to enforcement actions or potential litigation liabilities." *Id.* Rocket further admitted that in May 2020, the CFPB issued a civil investigative demand on Rocket Homes to determine if Rocket Homes "conducted any activities in a manner that violated RESPA and to determine if further CFPB action is necessary." ¶ 21. Following its four-year investigation, in December 2024, the CFPB filed a complaint against Rocket and a real estate brokerage company. ¶ 22.

On February 27, 2025, this complaint was dismissed by the Trump Administration. *Id.* As alleged in the Complaint, "[t]his dismissal has been linked to the Administration's efforts to gut the CFPB's powers entirely, and not a dismissal on the merits." *Id.* According to one news report, "'[t]he main U.S. agency tasked with overseeing the financial products and services used by everyday Americans – from credit cards to checking accounts to home loans – is the latest target of the

011352-11/3549648 V1

Trump administration's effort to remake the federal government. [] The [CFPB's] new leader has shuttered the agency's headquarters and told staffers to stay at home and refrain from doing any work.'" *Id.* The *New York Times* reported the Trump administration is in a "'fight to kill the [CFPB],'" and the acting Director has "'gutted much of the consumer bureau's work and tried to fire more than 90 percent of its staff.'" *Id.*

The Complaint further cites news reports that the dismissal of numerous complaints, including against Rocket, "'are the latest sign of the abrupt shift at the agency since [the Acting Director] took over,'" and "'[t]he decision to abandon the cases [including against Rocket] demonstrates the hands-off approach to regulation from the Trump administration[.]'" ¶ 23 n.19.

Less than three months after the CFBP filed its complaint, Rocket announced the acquisition of Redfin, a real estate company. ¶ 24. This acquisition was finalized on July 1, 2025, which brought more than 2,220 real estate agents into the Rocket orbit. *Id.* The Complaint alleges that "[u]pon information and belief, Rocket knew and recognized that it was engaged in illegal steering, and – after it was caught by the CFPB – decided to acquire Redfin to bring the steering practice in-house." *Id.*

011352-11/3549648 V1

### B.       The Steering Scheme

### 1.       Rocket's structure to funnel clients to Rocket Mortgage

Homebuyers begin their search by assessing their ability to qualify for a loan, searching websites for real estate, or both. *See* ¶¶ 31-33. In all cases, Rocket was structured to capture all these clients to steer them to Rocket Mortgage. *Id*. Rocket Mortgage is the second largest mortgage originator in the United States. ¶ 3.

If clients begin at Rocket Mortgage for preapproval, Rocket Mortgage encouraged these clients to go to Rocket Homes to look for a home. ¶¶ 31-32. Rocket Homes then matched these clients with a "Partner Agent," as described below.  ¶ 32. If the Partner Agent sells the home, that agent's brokerage pays Rocket Homes a kickback of 35% of the commission. *Id*. This payment is not in exchange for any service Rocket Homes or Rocket Mortgage performed related to the closing of the transaction. *Id*. This scheme served to profit Rocket Companies, the parent company of Rocket Homes and Rocket Mortgage. *See* ¶ 51.

If homebuyers first began looking at property on the Rocket Homes website (which is now effectively Redfin), Rocket Homes referred the homebuyers to the same Partner Agents referenced above. ¶ 33. In either situation, Rocket Homes received a kickback of up to 35% on closing. ¶¶ 32-33.

### 2.       The "Preserve and Protect" Agreement

The steering scheme began at least as early as 2019, when Rocket Homes required its "Partner Agents" to sign a "Preserve and Protect" Agreement.  ¶ 25. The

011352-11/3549648 V1

2019 Agreement provided that "'as a Broker in our Network, it is important to preserve and protect the relationship between the client and their [sic] ***chosen leader***, Quicken Loans [n/k/a Rocket Mortgage].'" ¶ 25 (emphasis in original). As the Complaint alleges, "[t]he meaning of 'purposefully' could mean anything Rocket wants it to mean, including the mere mention to clients of other possible lenders." ¶ 26. This agreement is in direct violation of agent's fiduciary duties to homebuyers. ¶ 28.

The Agreement directly tied a "Partner Agent['s]" performance to certain metrics, including "'Quicken Loans conversion," and "Quicken Loans Mortgage Banker satisfaction rating.'" ¶ 27. "Conversion" is the practice of signing up clients with Quicken Loans. The Complaint alleges that "Rocket Homes used these statistics to determine which agents received referrals, and how many they received. Quicken Loans loan officers also rated and tracked the rate at which Partner Agents steered clients to Quicken/Rocket Mortgage through a 'satisfaction rating' the loan officers gave to agents." *Id*.

Rocket Homes reminded agents of the "Preserve and Protect" requirement "every single time it made a referral," including warning agents that "'Rocket Mortgage is the client's chosen leader.'" ¶ 35. But the notion that the clients chose Rocket Mortgage "is plainly ***false***: many of these referrals [] had no connection with

011352-11/3549648 V1

Rocket Mortgage. These clients did not 'choose' Rocket Mortgage at all." ¶ 35 (emphasis in original).

Despite this fact, Rocket Homes pressured agents to reach an 80% conversion rate. ¶ 39. Rocket enforced this requirement with telephonic calls with brokers, including quizzing brokers to explain "'what steps they were taking to deal with agents who weren't hitting their capture-rate goals.'" *Id*.

The CFPB concluded this campaign to steer clients was successful: "'some agents hesitated to recommend certain loan options to clients, like first-time homebuyer assistance with down payments, USDA loans, and loans on manufactured housing, because Rocket Mortgage did not have those options (even as 70% of Rocket Homes consumers are first-time homebuyers)." ¶ 34. In addition, "'other agents deliberately steered clients away from comparison of Rocket Mortgage's subpar terms with other lenders' terms.'" *Id*. Rocket Homes also "threatened, suspended, and sometimes removed real estate agents that didn't adequately steer their clients away from other mortgage lenders." ¶ 36.

According to the CFPB, Rocket's enforcement tactics included "'reprimanding a real estate agent whose client complained about Rocket Mortgage's rates and fees seeming high, and the agent then suggesting the client get a second opinion from a local lender.'" *Id*. Rocket Homes also "'reprimanded another agent for telling their client that other lenders work with people who have

lower credit scores.'" *Id*. Rocket Homes routinely "punished" real estate agents who helped clients obtain down payment assistance if Rocket Mortgage did not participate in those programs. ¶ 37.  The CFBP concluded an "estimated 50% of all the penalties Rocket Homes assessed on real estate agents were for the agents' violations of the preserve and protect requirement." ¶ 38.

As a result of this pressure campaign, the CFBP found that many agents censored themselves in responding to client questions about other loans or loan programs, and instead steered homebuyers to Rocket Mortgage. This resulted in "'more than **10,000** additional referrals sent to Rocket Mortgage during 2019 compared with the previous year.'" ¶ 40 (emphasis added).

The 2022 Agreement maintained the "preserve and protect" requirement and again warned agents that a failure to adhere to the agreement "'could result in termination of the broker's relationship with Rocket Homes.'" ¶ 28.

## III.   ARGUMENT

### A.   Plaintiffs have sufficiently alleged standing through overpayment.

Rocket contends that "Plaintiffs do not allege that they suffered financial harm or any other concrete harm that would satisfy the injury-in-fact requirement." Mot. at 4, PageID.611. This is clearly false: each Plaintiff alleged that he or she was "pushed" or steered into using Rocket Mortgage. ¶¶ 9-11. Each Plaintiff accordingly

overpaid for loans that they could have obtained if they had not been steered. ¶¶ 35-40.

The CFBP – after a four-year investigation – concluded that "Rocket Mortgage charged higher rates and fees to consumers who went through the Rocket Homes network compared with consumers who didn't go through the network." ¶ 4. Plaintiffs were injured by Rocket's conduct because of this overpayment. *See In re Carter*, 553 F.3d at 989 (unlawful referrals are "plainly an individualized injury"); *Kallai*, 2021 WL 5961626, at *4 (plaintiffs properly pled standing under RESPA because they pled overpayment from higher settlement fees). To the extent Rocket suggests Plaintiffs should have pled their damages with precision, this is not necessary or expected at this stage; standing is sufficiently established by the *fact* of injury. *See Bledsoe*, 378 F. Supp. 3d at 641.[4]

Rocket contends Plaintiffs failed to allege they were eligible for certain loan assistance programs that they did not receive. Mot. at 5, PageID.612. But the class damages are not *limited* to cases in which homebuyers may qualify for assistance; the Complaint plainly alleges that Rocket's loans are more expensive and costly overall. *See, e.g.,* ¶¶ 4, 34, 40.

---

[4] Rocket claims the Complaint "relies on" a newspaper article to establish standing. Mot. at 4-5, PageID.611-612. This is plainly false; the article was cited as background for the larger harms caused by steering, nothing more. ¶ 47.

Rocket fails to address these allegations, other than to briefly suggest Plaintiffs simply "regurgitate[d] allegations abandoned by the CFBP." Mot. at 5 n.1, PageID.612. This is hardly a resounding denial. And the findings of a government investigation are clearly sufficient to establish plausibility, particularly when they are corroborated by the "Preserve and Protect" Agreement underlying the CFBP complaint. *See In re Auto. Parts Antitrust Litig.*, 2015 WL 13722902, at *4 (E.D. Mich. Aug. 31, 2015) (denying motion to dismiss when complaint contained summaries of government investigations and guilty pleas); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (outcome of government investigations established plausibility of plaintiffs' allegations); *Bueno v. Scott*, 2014 WL 1513000, at *6 & n.2 (S.D. Ohio Apr. 16, 2014) (internal investigation report sufficient to deny motion for judgment on the pleadings, despite conflicts between plaintiff's account and the report).

To the extent Rocket suggests CFBP's "abandonment" of the complaint is a reflection of its merits, the Complaint provides numerous (and well-known) reasons why this is not true, none of which Rocket addresses. *See* ¶¶ 22-24. As *Auto. Parts* recognized, the government's inaction does not undermine the veracity of allegations, because governmental decisions can be based on factors other than the merits of a claim. 2015 WL 13722902, at *4. Taken as a whole, as the Court must

- 12 -

do, the Complaint easily passes the plausibility test. *See In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005-06 (E.D. Mich. 2010).

In support Rocket cites *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576 (6th Cir. 2016), but in that case plaintiffs pled "in extreme generality" about "some of their employees" who might have needed certain medical treatment, and "some' employees who might delay medical care. *Id.* at 582. This is a far cry from these allegations, which specify that the federal government concluded that Rocket Mortgage's loans overall are more expensive.[5]

## B.   Plaintiffs' RESPA Claims Are Well-Pled

### 1.   RESPA Claims are not time-barred.

#### a.   The continuing violations doctrine applies.

Continuing violations of RESPA toll its one-year statute of limitations ("SOL"). *See Blake*, 259 F. Supp. 3d at 256-57 (discussing and adopting CFBP's decision on tolling SOL based on continuing violations); *see also Supriyanto v. Bank of Am.*, 2023 WL 7107133, at *7 (C.D. Cal. June 29, 2023) (applying continuing violations doctrine to RESPA violations, citing *Blake*).

---

[5] Rocket's other cases are easily distinguishable. *See* Mot. at 5-6, PageID.612-613 (citing *In re Apple Processor Litig.*, 2019 WL 3533876, at *6 (N.D. Cal. Aug. 2, 2019) (plaintiffs lacked standing to bring class claims based on test of a single iPhone) and *Thorne v. Pep Boys*, 397 F. Supp. 3d 657, 667-68 (E.D. Pa. 2019) (plaintiff lacked standing based on a "bare procedural violation which may result in no harm at all")).

Rocket argues *Blake* is wrong and inconsistent with the purported "holding" in *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 421 n.7 (6th Cir. 2009). Mot. at 8, PageID.615. But *Egerer* was *simply quoting the statute*; it was not "holding" anything (despite Rocket's misleading phrasing) and did not rule on the continuing violations doctrine at all. Rocket cites a contrary case, but neglects to explain why the CFBP's interpretation of its keystone statute, as referenced and adopted by *Blake*, was incorrect or should not be entitled to deference. *See, e.g., U.S. v. Mead Corp.*, 533 U.S. 218, 234 (2001) (deference justified based on agency's "specialized experience and broader investigations and information available to the agency"). The continuing violations doctrine applies here.

### b.    SOL is tolled based on fraudulent concealment.

Defendants argue fraudulent concealment does not apply because Plaintiffs' allegations are "conclusory." Mot. at 9, PageID.616. This is incorrect; the Complaint specifically alleges Defendants did not disclose to potential buyers that Rocket "partnership" agents are required to steer buyers to Rocket Mortgage or Quicken Loans, which is the cornerstone of Plaintiffs' claims. ¶ 62. Nor do Defendants disclose the kickback to Rocket. *See* ¶¶ 9-11, 62-63. These are specific facts (which Defendants have not denied), not conclusory allegations.

Defendants cite *Mullen v. Bank of Am.*, 2011 WL 6961005 (E.D. Mich. Nov. 7, 2011), but Mullen did not allege *any* facts supporting tolling when she filed her

- 14 -

complaint seven years after closing. *Id.* at *3. And in *Smith v. Lawyers Title Ins. Corp.*, 2009 WL 514210 (E.D. Mich. Mar. 2, 2009), plaintiff failed to allege he was unaware of the overcharge before the statute of limitations deadline. *Id.* at *6. Plaintiffs make those allegations here. ¶¶ 9-11.

Defendants further contend Plaintiffs cannot allege equitable tolling because the CFPB lawsuit was filed in December 2024, which ostensibly put Plaintiffs on notice. But that argument directly contradicts Defendants' own argument that CFPB "abandoned" these claims "just six days after Rocket Homes moved to dismiss the complaint." Mot. at 5 n.1, PageID.612. A reasonable person would regard this "abandon[ment]" by the premier financial enforcement agency as an indicator that she does not have a claim. *See Bowen v. City of New York*, 476 U.S. 467, 480 (1986) (statute of limitations tolled when government's ineligibility determinations were thought to be "considered judgment" of agency, when class members could not have known about procedural irregularities underlying decisions). The plausibility of this belief is a factual question that cannot be resolved on a motion to dismiss. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2018 WL 4352707, at *7.

### 2. Rocket engaged in an unlawful steering scheme under RESPA.

Plaintiffs have plausibly plead the three elements of RESPA: "1) a payment or a thing of value; 2) made pursuant to an agreement to refer settlement business; and 3) an actual referral." *See* Mot. at 12, PageID.619.

- 15 -

### a.   Rocket's steering scheme involved an exchange of a "thing of value."

RESPA's implementing regulation, Regulation X, explains that "thing of value" is broadly defined, and includes commissions and the opportunity to participate in a money-making program. 12 C.F.R. § 1024.14(d); *see also Kallai*, 2021 WL 5961626, at *5-9 (adopting Regulation X definition).

Rocket's unlawful scheme involved an exchange of things of value ¶ 7. Rocket sent leads to real estate agents. ¶¶ 27-30. An agent's income depends on commissions from closing a home; leads are directly tied to their income and allow them to participate in a money-making program. ¶ 45. In exchange for the leads, real estate agents steered homebuyers to use Rocket Mortgage and gave 35% of their commissions back to Rocket Homes. ¶¶ 32-33. Commissions provided to Rocket Homes are plainly a thing of value. ¶ 7. Rocket Mortgage also received a thing of value from the steering scheme as each potential loan is an opportunity to participate in a money-making program. ¶¶ 7, 45, 66.

Defendants attempt to minimize the obvious value being exchanged, but their rhetoric is belied by their conduct: Rocket monitored real estate agent's conversion rates to Rocket Mortgage, pressured agents to have 80% of their clients use Rocket Mortgage, reprimanded agents who did not steer enough homebuyers to Rocket Mortgage, and profited from the scheme. ¶¶ 27, 34-40, 51, 63.

011352-11/3549648 V1

Specifically, Defendants falsely assert that "an opportunity to participate in a money-making program" is a not a thing of value under RESPA. Mot. at 16-18, PageID.623-625. This is obviously contrary to Regulation X.[6] And the opportunity to participate in a money-making scheme is directly tied to RESPA's definition of "payment" in the statute. *See* 12 U.S.C. § 2602(2) ("[T]he term 'thing of value' includes any payment, advance, funds, loan, service, or other consideration." The opportunity to participate in a money-making scheme constitutes a service or other consideration.); *see also Kallai*, 2021 WL 5961626, at *5-9 (RESPA should be broadly construed under traditional canons of statutory interpretation). Defendants cannot avoid Regulation X's plain meaning, or the common-sense conclusion from their own conduct that referrals were *extremely* valuable to all parties involved. *See* ¶¶ 27, 34-40, 51, 63.

Defendants assert that referrals are "too abstract" and thus do not qualify as a thing of value. Mot. at 17, PageID.624. This argument is once again belied by Defendants' own conduct, which clearly evinced a keen interest in tracking and

---

[6] Defendants argue *Loper Bright* essentially invalidated Regulation X. *See* Mot. at 8, PageID.615 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)). This is false. *Loper Bright* involved the legality of an agency's actions in interpreting an ambiguous statute. But this case does not involve agency action, and in any event Congress delegated authority to the CFPB to implement interpretative RESPA-related regulations. 12 U.S.C. § 2617(a); *see also Morgan v. Caliber Home Loans, Inc.*, 26 F.4th 643, 648 (4th Cir. 2022) ("The CFPB has enforcement authority for RESPA."). *Loper Bright* is irrelevant here. *See Dept. of Labor v. Americare Healthcare Servs. LLC*, 762 F. Supp. 3d 666, 685 (S.D. Ohio Jan. 9, 2025) (*Loper Bright* does not apply when Congress delegated rulemaking authority to agency).

monitoring these referrals. *See* ¶ 27; *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1181-84 (9th Cir. 2015) (contractual obligation to refer business was "thing of value" under RESPA even if the referrals did not directly "involve a transfer of money"); *Palombaro*, 2017 WL 3437559, at *12 (certifying a class based on allegations of a "widespread kickback scheme" involving referral agreements); *Kallai*, 2021 WL 5961626, at *9 (plaintiffs plausibly alleged a kickback scheme involving referrals and the opportunity to participate in a money-making program).

*Gomez* and *Borders & Borders*, cited by Rocket (Mot. at 17, PageID.624), are easily distinguishable. In *Gomez v. Wells Fargo Bank, N.A.*, the court rejected a RESPA claim because the plaintiff's appraisal process was not controlled by defendant Wells Fargo, and Wells Fargo received no "improper benefit" from the appraisal. 676 F.3d 655, 663-664 (8th Cir. 2012). In *Borders & Borders*, the court rejected a RESPA claim because the only thing of value was a nominal assignment, and the only payments by consumers were for title services they actually received. *CFPB v. Borders & Borders, PLC*, 2018 WL 1440606, at *4 (W.D. Ky. Mar. 22, 2018). Unlike these cases, the scheme the Complaint alleges is concrete and demonstrates an unlawful increase in the cost of settlement services. *See* ¶¶ 3-7, 9-11, 25-46, 49-50. Furthermore, at the pleading stage, plaintiffs only need to prove "the existence of an exchange involving a referral agreement." *Edwards*, 798 F.3d

- 18 -

at 1182. Plaintiffs have plausibly alleged an exchange involving things of value and a referral agreement.

### b.     Rocket's unlawful steering scheme involved an agreement to refer settlement business, and actual referrals occurred.

Regulation X clarifies that "[a]n agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct." 12 C.F.R. § 1024.14(e). Further, "[w]hen a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business." *Id.*

Defendants misconstrue Plaintiffs' allegations to be limited to the "preserve and protect" policy. Mot. at 13-15, PageID.620-622. This policy is only one aspect of Plaintiffs' complaint that demonstrates an agreement to refer settlement business. ¶¶ 27, 31-33, 36-46.

The Preserve and Protect Agreement served to remind real estate agents of the wider agreement to refer homebuyers to Rocket Mortgage in exchange for more leads. *See* ¶¶ 35-40. The overall agreement went far beyond respecting a client's choice of chosen lender. Rocket tracked the number of homebuyers that an agent convinced to use Rocket Mortgage. ¶ 27. These conversion statistics influenced the number of leads that an agent received. *Id.* Rocket removed agents who did not

- 19 -

adequately steer clients to use Rocket Mortgage and pressured agents to have four out of five of their clients use Rocket Mortgage. ¶¶ 36-40. Indeed, Rocket Homes "***punished*** real estate agents who helped their clients obtain down payment assistance if Rocket Mortgage didn't participate in those programs." ¶ 37 (emphasis in original).

These tactics compelled agents to persuade homebuyers to use Rocket Mortgage. ¶¶ 9-11, 35-40, 44-46. Rocket's pressure on agents to steer homebuyers towards Rocket Mortgage represents a pattern of conduct demonstrating an agreement to refer business. *See* ¶¶ 27, 31-33, 36-46. Defendants are trying to distance themselves from their own conduct here. Mot. at 13-15, PageID.620-622.

Defendants suggest that the Preserve and Protect Agreement merely respected consumer choices. Mot. at 13-14, PageID.620-621. This fabricated narrative is plainly false. The Preserve and Protect Agreement forced agents to steer clients to use Rocket Mortgage even if they merely had a pre-approval letter from Rocket Mortgage. ¶¶ 25-31. Getting a pre-approval letter is just a first step in the homebuying process: a substantial number of potential buyers obtain a mortgage through other lenders. ¶ 31. Real estate agents and brokers in the scheme are not merely "refrain[ing] from interfering with a client's chosen lender." Mot. at 15, PageID.622. Instead, agents are required to push homebuyers to continue to use Rocket Mortgage even if doing so violates their fiduciary duties to clients. ¶¶ 3, 28.

- 20 -

This scheme caused real estate agents to refer clients to Rocket Mortgage and affirmatively influenced them to use Rocket Mortgage. *See* ¶¶ 9-11, 35-40. The CFPB estimates that the steering scheme led to more than 10,000 additional referrals to Rocket Mortgage in 2019 alone, proving the steering scheme was effective. ¶ 40. RESPA was enacted to prevent unnecessary increases in cost. *See* 12 U.S.C. § 2601(b)(2). Plaintiffs have plausibly alleged an unlawful steering scheme that has caused consumers to pay unnecessary costs and fees, in violation of RESPA. *See* ¶¶ 25-40, 47-50.

### 3. RESPA's cooperative brokerage safe harbor does not apply.

Defendants fundamentally misunderstand RESPA's safe harbor provisions. While RESPA includes a safe harbor provision allowing for "cooperative brokerage and referral agreements," it does not permit payments between mortgage lenders and real estate agents for referrals. The cooperative brokerage safe harbor "refers only to fee divisions within real estate brokerage arrangements when all parties are acting in a real estate brokerage capacity and has ***no applicability*** to any fee arrangements between real estate brokers and mortgage brokers or between mortgage brokers." 12 C.F.R. § 1024.14(g)(v) (emphasis added); *see In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *3 (W.D. Wash. Apr. 19, 2019) ("RESPA's safe harbor prohibits "'payments for referrals'") (quoting *PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 40, (D.C. Cir. 2016)); *Palombaro*, 2017 WL 3437559, at *13 (only relevant

- 21 -

safe harbor against mortgage lender was whether there were payments "for services actually performed").

Defendants falsely contend that the only parties to the referral agreements were Rocket Homes and third-party real estate brokers. Mot. at 10, PageID.617. This is plainly not true. Rocket Mortgage benefited and was a member of the steering scheme. ¶¶ 3-5, 7, 25-29, 32-33. Rocket Mortgage is a mortgage lender, not a real estate broker, and the cooperative brokerage safe harbor cannot apply. *See* ¶ 13.

Rocket Mortgage's participation in the scheme is a crucial aspect of Plaintiffs' complaint. Loan officers from Rocket Mortgage (formerly Quicken Loans) rated and tracked the rate at which agents steered clients to Rocket Mortgage. ¶¶ 27-29. These ratings were used to determine the number of referrals that real estate agents received. *Id*. Real estate agents were even required to warn Rocket Mortgage when homebuyers were considering other lenders. ¶ 29.

In addition, real estate agents receive commissions from home sales. Commissions are directly tied to the amount of leads a real estate agent receives. ¶ 45. Thus, the opportunity to help homebuyers purchase a home represents an "opportunity to participate in a money-making program." *See* ¶ 7. Defendants fail to engage with these allegations and ignore the role that Rocket Mortgage played in the steering scheme. ¶¶ 3-5, 7, 25-29, 32-46.

- 22 -

At the very least, the existence of a legitimate cooperative brokerage agreement between only real estate agents and real estate brokers is a fact question. It is not grounds for dismissal. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 761 (3d Cir. 2009) ("Whether it is or is not a legitimate business arrangement—and, thus, whether it is exempted by section 8(c)—is a fundamental merits question that has no bearing whatsoever on what is before us."); *White v. PNC Fin. Servs. Grp., Inc.*, 2014 WL 4063344, at *8 (E.D. Pa. Aug. 18, 2014) (denying motion to dismiss in RESPA case when the exact agreement between defendants was unclear and further discovery was required). Plaintiffs' allegations contain plausible claims that Rocket Mortgage was a party to the referral arrangement and steering scheme. ¶¶ 3-7, 27, 32-40.

RESPA was enacted to prevent "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2). Homebuyers steered to use Rocket Mortgage paid higher rates and fees. ¶ 49. The steering scheme orchestrated by Rocket is exactly the kind of scheme that RESPA is designed to prevent. Defendants cannot hide behind RESPA's safe harbor to avoid liability.

- 23 -

### C.      Defendants Plausibly Allege Unjust Enrichment Claim

#### 1.      Defendants were unjustly enriched by their fraudulent scheme.

Defendants contend Plaintiffs' unjust enrichment ("UE") claims should be dismissed because they are purportedly governed by their mortgage agreements. Mot. at 19-20, PageID.626-627. But there is nothing before the Court on what these mortgage agreements contain, let alone whether they cover Defendants' steering conduct. Defendants cannot vaguely refer to a contract that is not before the Court and claim that it governs Plaintiffs' RESPA violations. And even if these phantom contracts govern, Plaintiffs are allowed to plead unjust enrichment in the alternative when there is a dispute as to whether an express agreement exists. *See Solo v. UPS*, 819 F.3d 788, 796 (6th Cir. 2016).

Next, Defendants suggest UE claims are not viable because Defendants deserved what they received, and argue that Plaintiffs did not allege "they would have gotten better financing or cheaper services elsewhere" (Mot. at 21, PageID.628), but this is *precisely* what Plaintiffs allege here. *See, e.g.,* ¶¶ 4, 34. A jury, not Defendants, should decide whether Rocket is entitled to the funds that it obtained illegally.

Finally, Defendants maintain that the UE claim fails because Plaintiffs' RESPA claim fails. This argument adds nothing to the Court's analysis, and Plaintiffs have plausibly alleged multiple RESPA violations here. *See supra* § II.C.

011352-11/3549648 V1

### 2.    The nationwide unjust enrichment class is well-pled.

Buried in a footnote, Rocket contends Plaintiffs lack standing to bring unjust enrichment claims under the laws of states in which they do not reside. This question should be resolved at the class certification stage, when the Court is better situated to analyze the adequacy of the class representatives and any differences among the states' laws. *See Bledsoe*, 378 F. Supp. 3d at 642 ("the certification issues in the instant case are logically antecedent to the Article III standing concerns, and the determination of standing will be postponed until a class certification ruling.") (citing multiple cases). The nationwide class action should be tested at the Rule 23 stage.

### D.    Defendants' Remaining Arguments Fail[7]

### 1.    Plaintiffs did not engage in group pleading.

Defendants claim Plaintiffs engaged in group pleading such that they are unaware of what each individual Defendant did. *See* Mot. at 22-23 (PageID.629-630). This argument is nonsense. There are three Rocket entities identified, with their roles clearly detailed in the Complaint. *See* ¶ 12 (Rocket Companies is holding company); ¶ 27 (Rocket Mortgage was mortgage company to which loan business was illegally steered); ¶¶ 27, 35-41 (Rocket Homes managed "Partner Agents" to ensure illegally steering to Rocket Mortgage and Amrock). The use of the term

---

[7] Plaintiffs concede claims against Amrock Holdings should be dismissed.

"Rocket" is not group pleading since the individual defendants' roles are clearly identified. *See Glass*, 2020 WL 3086602, at *4 (complaint not group pleading by referencing "deputy jailers" when it alleges what each defendant did); *Wesley Corp.*, 2017 WL 1295529, at *2 ("common practice" to refer to Defendants when they collectively engaged in tortious conduct). Defendants cannot reasonably claim they are not on notice as to what they did. *See id.*

### 2. There is no basis to dismiss claims against Rocket Companies.

Defendants assert that claims against the "Rocket Companies" should be dismissed because it is a parent company. *See* Mot. at 23, PageID.630. But Rocket Companies is the entity that clearly received the ill-gotten gains (¶ 51), they spoke on behalf of the Rocket entities in crucial respects, and they acquired Redfin to bring the steering in-house (*see* ¶¶ 2, 20, 42 n.38). For the UE claim, Rocket Companies would be required to disgorge their ill-gotten gains. And Rocket Companies' liability for the conduct of its subsidiaries is a fact-intensive question that cannot be resolved here. *See, e.g., Chism v. Chemring N. Am. Grp., Inc.*, 2015 WL 8207899, at *4 (W.D. Tenn. Dec. 7, 2015).

### 3. There is no basis to strike Redfin allegations.

In December 2024, the CFBP filed its Complaint against Rocket (and other companies), alleging that it operated a vast referral network of agents to carry out its steering scheme. ¶ 22. On March 10, 2025, Rocket announced its acquisition of

Redfin, the "most visited brokerage site." ¶¶ 24, 42. A few months after Redfin's acquisition, Rocket's CEO Varus Krishna announced that "[w]e are building a vertically integrated homeownership platform for the AI era." ¶ 2. Numerous real estate commentators connected the dots. *See* ¶ 44 n.42 (YouTube video entitled "How Rocket Mortgage's Redfin Acquisition Could DESTROY Traditional Real Estate."). As one commentator noted, Rocket's acquisition of Redfin means "Redfin agents are required to push their company Rocket Mortgage." ¶ 44; *see also* ¶ 44 n.44 (agents are "most likely required to send you a referral to Rocket Mortgage").

Defendants ask this Court to believe that there is no basis to include these allegations. Mot. at 24-26, PageID.631-633. But once again, Defendants' own conduct undercuts this argument. Rocket CEO proclaimed that Rocket is moving toward its goal of vertical integration after Redfin's acquisition. ¶ 2. The plausible interpretation of this statement, in light of all the other allegations, is that Defendants are funneling home buyers from initial search to obtaining a mortgage to closing. Defendants argue that these allegations are "inflammatory," "demonstrably false" and "immaterial" (Mot. at 24-25, PageID.631-632) but their materiality is highlighted by Defendants' vituperative response: Rocket's decision to bring the steering in-house reflects consciousness of guilt and represents a further effort to conceal its RESPA violations.

- 27 -

Defendants take particular issue with two groups of statements. The first is that "[s]ome clients also start the home buying process on Rocket Homes, which is now Redfin." ¶ 33.  The clear meaning of this allegation is that Redfin is now taking the place of what Rocket Homes used to do, even if they are separate entities. *See* ¶¶ 24, 42-44. Defendants may not like the implication of this allegation, but that does not make it "irrelevant" (let alone "inflammatory"). Second, Defendants object to the Redfin allegations because Redfin's acquisition occurred after Plaintiffs purchased their homes. Mot. at 25, PageID.632. But, as stated above, Rocket's decision to acquire Redfin to bring the steering in house is highly relevant to the allegations against Rocket. It helps prove the entire scheme. Again, the relevance of these allegations is measured by Rocket's strident objections against them.[8]

There is no basis to strike these allegations.

## IV.   CONCLUSION

Defendants' motion to dismiss should be denied.

DATED: April 27, 2026                    Respectfully submitted,

By: */s/ Steve W. Berman*
Steve W. Berman
Jerrod C. Patterson
Amna Amin
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101

---

[8] Defendants cite in support *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760 (E.D. Mich. 2014), but that case involved a real estate dispute where the plaintiff made unfounded and salacious allegations that defendants may have been laundering money to Hezbollah. *Id.* at 777.

011352-11/3549648 V1

Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com
amna.amin@hbsslaw.com

David J. Shea (P41399)
Ashley D. Shea (P82471)
**SHEA LAW, PLLC**
26100 American Dr., 2nd Foor
Southfield, MI  48034
Telephone: (248) 354-0224
david.shea@shealaw.com
ashley.shea@sadplaw.com

*Attorneys for Plaintiffs*

- 29 -

011352-11/3549648 V1

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

/s/ Steve W. Berman
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Plaintiffs*

- 30 -

011352-11/3549648 V1